FILED

2015 JAN -7 P 2: 30

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

# UNITED STATES DISTRICT COURT FOR

## THE EASTERN DISTRICT OF VIRGINIA - ALEXANDRIA

DAVID ALEXANDER, an individual,       )     Case No. /:/5 CV /7
                                      )            LMB / IDD
            Plaintiff,                )     **COMPLAINT FOR DECLARATORY**
                                      )     **RELIEF**
v.                                    )
                                      )
ANTHEM LIFE INSURANCE                 )
COMPANY, NAVIGATION ARTS,             )
LLC SHORT AND LONG TERM               )
DISABILITY PLAN,                      )
                                      )
            Defendants.               )
_____       )

Plaintiff, David Alexander ("Plaintiff" or "Alexander") alleges as follows:

## JURISDICTION

1.     Plaintiff's claim for relief arises under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. section 1132(a)(1). Pursuant to 29 U.S.C. section 1331, this court has jurisdiction over this action because this action arises under the laws of the United States of America. 29 U.S.C. section 1132(e)(1) provides for federal district court jurisdiction of this action.

///

### VENUE

2.      Venue is proper in the Eastern District of Virginia in that Plaintiff is and was a resident in the city of Reston, in the County of Fairfax, and in the State of Virginia, when Defendants denied Plaintiff's short term disability benefits and his long-term disability benefits. Therefore, 29 U.S.C. section 1132(e)(2) provides for venue in this court.  Intradistrict venue is therefore proper in the Alexandria branch of this Court.

### PARTIES

3.      Plaintiff is, and at all times relevant hereto was, a participant, as that term is defined by 29 U.S.C. section 1000(7), of the Navigational Arts, LLC Short and Long Term Disability Plan ("The Plan"), and thereby entitled to receive benefits therefrom.  Plaintiff was a beneficiary because he was an employee of Navigational Arts, LLC, which established the plan for its employees' benefit and is the plan sponsor.

4.      Defendant, The Plan, is an employee welfare benefit plan organized and operating under the provisions of ERISA, 29 U.S.C. section 1001 et seq.

5.      Defendant Anthem Life Insurance Company ("Anthem"), issued Policy Number 20362000V ("The Policy"), to Navigational Arts, LLC, and thereby insured the plan and is obligated to provide all benefits claimed, and acted on behalf of the plan in all matters alleged herein, including making the decisions to deny Plaintiff's STD and LTD benefits and to deny his appeal of those decisions.

### FACTS

6.      The Policy has the following relevant terms regarding short term disability ("STD") benefits:

A.      Disabled is defined as:

"During the Elimination Period and thereafter because of Your

Injury or Illness, *all* of the following are true:

* You are unable to do the Material and Substantial

Duties of Your Own Occupation; *and*

* You are receiving Regular Care from a Physician

for that Injury or Illness; *and*

  *   Your Disability Work Earnings, if any, are less than

or equal to 80% of Your Weekly Earnings."

B.   Proof of disability is defined as:

"Evidence satisfactory to Us that a person has satisfied the

conditions and requirements for a benefit under the Policy.  The

Proof must establish:

  *   the nature and extent of the loss or condition; *and*

  *   Our obligation to pay the claim under the Policy;

*and*

  *   the Claimant's right to receive the payment."

C.   Illness is defined as:

"A sickness or disease and will include pregnancy.  Disability

resulting from the sickness or disease must begin while You are

covered under the Policy."

D.   Own occupation is defined as:

"The occupation that You regularly performed and for which You

were covered under the Policy immediately prior to the date Your

Disability began.  The occupation will be considered as it is

generally performed in the national economy, and is not limited to

the specific position You held with the Plan Sponsor."

E.   Material and substantial duties is defined as:

"Duties that:

  *   Are normally required for the performance of Your Own

Occupation or any occupation; *and*

  *   Cannot be reasonably omitted or modified except that We

will consider You able to perform the Material and

Substantial duties You are working or have the capability to

work your normal scheduled work hours."

F.    The STD portion of the Policy provides short term disability benefits after an elimination period of 15 days, for which such benefits potentially could continue for 11 weeks.

7.    The Policy has the following relevant provisions regarding LTD benefits.

A.    Proof of disability is defined as:

"Evidence satisfactory to Us that a person has satisfied the conditions and requirements for a benefit under the Policy. The Proof must establish:

*     the nature and extent of the loss or condition: *and*

*     our obligation to pay the claim under the Policy; *and*

*     the Claimant's right to receive payment."

B.    Disability is defined as:

"During the Elimination Period and the next 24 months because of Your Injury or Illness, *all* of the following are true:

*     You are unable to do the Material and Substantial Duties of Your Own Occupation; *and*

*     You are receiving Regular Care from a Physician for that Injury or Illness; *and*

*     Your Disability Work Earnings, if any, are less than or equal to 80% of Your Indexed Monthly Earnings.

Thereafter, Disabled and Disability mean because of Your Injury or Illness *all* of the following are true:

*     You are unable to do the duties of any Gainful Occupation for which You are or may become reasonably qualified by education, training or experience; *and*

*     You are receiving Regular Care from a Physician

for that Injury or Illness; *and*

    *     Your Disability Work Earnings, if any are less than or equal to 60% of Your Indexed Monthly Earnings."

C.     Elimination Period is defined as:

"The period of continuous Disability which must be satisfied before You are eligible to receive benefits under the Policy. The Elimination Period is shown in the Schedule of Benefits of this plan and begins on the first day You meet the Definition of Disability."

D.     Gainful occupation is defined as:

"An occupation that is or can be expected to provide You with an income within 12 months of Your return to work that exceeds 60% of Your Indexed Monthly Earnings."

E.     Material and substantial duties is defined as:

"Duties that:

    *     Are normally required for the performance of Your Own Occupation or any occupation; *and*

    *     Cannot be reasonably omitted or modified except that We will consider You able to perform the Material and Substantial duties You are working or have the capability to work your normal scheduled work hours."

F.     Own occupation is defined as:

"The occupation that You regularly performed and for which You were covered under the Policy immediately prior to the date Your Disability began. The occupation will be considered as it is generally performed in the national economy, and is not limited to the specific position You held with the Plan Sponsor."

8.    The Policy has a "Self-Reported Symptoms benefits as follows:

A.    Self-Reported Symptoms Means

"Manifestations of Your condition that are not objectively verifiable using tests, procedures or clinical examination according to generally accepted medical practice. Examples of self-reported symptoms include, but are not limited to, headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy."

B.    "Monthly Benefit Payments are limited to a maximum of 24 months during Your lifetime for Disabilities that are based on Self-Reported Symptoms, unless:

1.    You continue to meet all of the Policy's terms and conditions; *and*

2.    You meet either of the following conditions:

a.    You are receiving payments from Social Security as a result of Your Disability. Then Your payment period will be limited to the normal Maximum Benefit Period as described under the Policy.

b.    You are confined to a Hospital or Medical Facility at the end of he 24 month period. Then We will continue to send You payments during Your confinement."

9.    As relevant here, The LTD portion of The Policy provides long-term disability benefits after an elimination period of 90 days. For a person under the age of 60 at the time the disability occurred, as was Plaintiff herein, such benefits potentially could continue until Plaintiff reaches the age of 67.

10.    Plaintiff was employed by Navigational Arts, LLC, as a Senior Information Architect.

11.     Plaintiff became disabled November 8, 2013, and applied for STD and later for LTD disability benefits.

12.     Alexander has been diagnosed with various conditions in his quest to find a cure for his symptoms. He has seen many qualified, quality physicians who have suggested or provided many different diagnoses. Despite the lack of one or more confirmed diagnoses, Alexander has consistently reported the same symptoms, including pain in his neck, left and right upper extremities, and both lower extremities and back; severe fatigue; depression; difficulty remembering; and word finding problems. Alexander has consistently described his pain as being dull, aching, shooting, burning, and tingling. He also experiences numbness and swelling. Alexander does not need a specific or certain diagnosis to be disabled under the terms of The Policy.

13.     By letter dated February 24, 2014, Anthem denied Alexander's application for STD benefits.

14.     By letter dated March 21, 2004 Anthem denied Alexander's application for LTD benefits.

15.     Alexander's doctors supported his claims for disability benefits, as summarized in Paragraphs 16-20, below.

16.     Dr. Andrew Chmiel wrote, in part, in his March 19, 2014, report:

"I am writing in support of the appeal of Mr. David Alexander regarding the denial of his application for short term disability. As his psychiatrist, I am not writing from a vantage point of his psychiatric symptomotology. His psychiatric symptoms have definitely impeded his function, but they are secondary to his medical illness."

"As his physician I have observed the progressive downhill course of his illness with deterioration in function to the present working diagnosis of Undifferentiated Collagen Vascular Disease. There has been joint, and muscle pain which required opiod therapy which further slowed him down and added to the 'mental fog'. As a result he lost a major contract for his company. He has traveled to Baltimore, D.C., and northern Virginia as part of his diagnostic work up."

"Meanwhile the situation is impacting his marriage. He is now in couple's therapy. The counselor recently completed a Beck's Depression Inventory in which Mr. Alexander scored 56 in the

severely depressed range."

"If there has been any improvement in function in recent physician records, it is only because he has been able to be off work to gather his resources and pursue evaluation."

17.   In his report dated April 22, 2014, Dr. John Feola wrote, in part:

"In the documentation submitted with his application, I diagnosed David's condition as Fibromyalgia. The pain associated with Fibromyalgia is chronic and debilitating. The underlying cause of Mr. Alexander's Fibromyalgia has not yet been identified, but David is continuing diagnostic testing specific medical doctors and Johns Hopkins University Center, including a full body MRI for vascular dysfunctions, a lung biopsy for an autoimmune disease, and testing for connective tissue genetic disorders."

"You characterized Mr. Alexander's occupation as 'sedentary,' but this is a serious mischaracterization of David's occupation. Mr. Alexander is a knowledge worker, working as a Senior Information Architect, a consultant, at a high end User Experience Design Firm. Chronic and debilitating pain impairs his ability to concentration [sic] in his job that involves critical thinking, strategic problem solving and information analysis; and in fact, I prescribed Nuvigal, a medication to help reduce his 'brain fog', or in other words, cognitive dysfunction."

"In my medical opinion and in the opinion of Mr. Alexander's other treating physicians, as per the document submitted with David's application, he qualifies for short term disability, and long term disability after his short term disability coverage in February 2014."

18.   In her May 2, 2014, report, Dr. Lisa Christopher-Stine's wrote:

"Mr. Alexander is a 38 y.o. male with sacroidosis suspected to involve the skin, lymph notes, one marrow and joints. Based on radiographic imaging, clinical history and patient reported symptoms, this diagnosis is strongly suspected based on chronic pain, evidence supporting an underlying myopathy, mild intrathoracic adenopathy, and elevated serum ACE level.

I agree that sarcoidosis would be part of the differential diagnosis to explain the multisystem nature of the patient's complaints. None of the patient's symptoms nor the few abnormalities (elevated serum ACE, myalgias, arthralias) are specific nor pathognomonic for sarcoidosis. However, at present he has few other distinguishing features to strongly suggest an alternative diagnosis."

"Muscle biopsy was not normal with findings of type 2 atrophy – which may be seen with connective tissue diseases. Sarcoidosis could be contributing to this abnormality."

"Overall, he remains complex, debilitated by the constellation of

symptoms despite a Fully unifying diagnosis to explain all of the signs and symptoms of this illness."

19.   In his May 9, 2014, report, Dr. Feola wrote, in part:

"I am writing regarding David Alexander's conditions which began in 2009 and continued regressively until on November 9th, 2013, he was unable to work, rendering him disabled."

"Mr. Alexander suffers from a chronic pain syndrome, undifferentiated collagen vascular disease, and fibromyalgia. Due to these conditions and his medication side effects, he is totally disabled from all occupations. His condition prevents him from any substantial gainful activity based on these medical impairments and may continue for a long time and indefinite duration."

"He has applied short and long term disability claim, [sic] which was denied, and I have written in appeal of the denials of both those decisions based on my continued evaluations of David's health."

"In my medical opinion and in the opinion of Mr. Alexander's other treatment physicians, as per the documentation submitted with David's application, he qualified for short term disability, and long term disability after his short term disability coverage ended in February 2014."

20.   By report dated August 7, 2014, Robin Feldman, Alexander's therapist wrote:

"I have been David Alexander's therapist since 1/4/13. He has attended weekly sessions over the past year and a half for treatment and management of anxiety and depression. David's dominating complaint at the time of intake was chronic pain that was not only affecting him physically, but increasingly on an emotional level."

"When treatment began, David's ability to perform his job duties were becoming increasingly compromise (sic) due to his chronic pain and time lost due to multiple weekly doctor's appointments. David has spend hundreds of hours going to doctors appointments, medical procedures and surgery. As a result, David lost his job and his marriage has spiraled into crisis. He has run out of money and has had to go on Welfare and is at high risk of losing his home."

"David's chronic pain continues to greatly effect all aspects of his life. I vouch for how hard David's fought to keep his job meanwhile hopeful he would receive a diagnosis and subsequent treatment that would resolve his chronic pain. This still has not happened. Given his continuing chronic pain with no definitive diagnostic cause, David's mental health has deteriorated since initially seeking mental health treatment. Consequently, David is neither mentally or physically capable of working or earning money at this time which only compounds his financial difficulty and marital discord."

"David's financial difficulty is impacting his basic needs and

ultimately putting him at risk of homelessness.  In my professional opinion, David clearly deserves and is entitled to short term disability."

21.    Alexander underwent a Cardiopulmonary Evaluation Test ("CPET") on July 28-29, 2014, at the Ithaca College's Department of Exercise and Sports Sciences._The Ithaca College's ("Ithaca") two-day cardiopulmonary stress-test protocol was developed specifically to assess the effects of post-exertional malaise ("PEM") on ability to do work in those with chronic fatigue syndrome ("CFS") or other fatiguing illnesses, where, as noted by the Centers for Disease Control, increase in symptoms and malaise extend 24 hours beyond physical or mental capacity. The testing protocol consists of riding a bicycle to maximal effort while blood pressure, ECG and expired gas analysis are collected, and follows standard guidelines outlined by the American College of Sports Medicine, American Heart Association and the American Thoracic Society. Although its testing paradigm is novel in this context, cardiopulmonary exercise testing (CPET) is used widely in various clinical and research settings, including evaluation for disability determinations.

22.    Ithaca employs testing protocols endorsed by the American Medical Association and all the major medical organizations as the gold standard for measuring functional capacity. CPET can reliably distinguish between malingering and true disability and the results can separate out the primary cause of exercise intolerance, including physical deconditioning. Ithaca was able to determine Alexander was not malingering and is truly disabled as is reflected in his CPET results.  Alexander's July 28 and 29, 2014, CPET study was performed by Betsy Keller, Ph.D. at Ithaca.   Dr. Keller notes in her August 12, 2014 summary of her findings that Mr. Alexander displayed:

"Low functional capacity and impaired ability for aerobic energy production:

1.    Low aerobic capacity (VO3max).  VO2max is 20-29% lower than age and sex normative values.
2.    Low anaerobic threshold of 12.9 ml·kg-1min-1 (3.2 corrected METS*).  If this patient had a diagnosis of cardiac failure, according to the functional impairment classification of Weber & Janicki, his anaerobic measurement would classify him as mild-moderate

impairment.

3.      Anaerobic threshold did not reproduce; decreased 48% on test 2 to 6.8 ml·kg-1min-1 (1.7 corrected METS*).  If this patient had a diagnosis of cardiac failure, according to the functional impairment classification of Weber & Janicki, his anaerobic threshold measurement would classify him with severe impairment."

\* \* \* \*

"A 39 yr old male was referred for testing on 7/28/14 for chronic fatigue, abnormal ECG, chest discomfort and palpitations.  Onset of excessive fatigue began in 2010 following a neck pain he experienced while lifting one of his children.  Various symptoms emerged during the next two years that included fibromyalgia pain, especially in the neck, back and left knee, and less so in the arms, hands (carpal tunnel) and feet, headache, extreme fatigue, rash on feet and ankles, edema of ankles and legs, muscle weakness and loss of muscle mass, unexplained weight loss (55 lbs in 7 months), impaired thermoregulation, and decreased cognitive function (difficulty concentrating, impaired work recall, memory and verbal comprehension, overall decreased speed of information processing).  He continues to experience all of these symptoms presently with the exception of carpal tunnel pain and ankle/let edema.  He reports anxiety and depression secondary to his illness. In May 2013 he was diagnosed with undifferentiated collagen vascular disease and suspect of Ehlers-Danlos Syndrome (EDS) when he presented with hypermobility, hypogonadism, and elevated CPK-enzyme market consistent with muscle damage. Subsequently, tests revealed elevated IGF-1 and suppressed growth hormone.  In June 2014, during a bronchoscopy to assess for sarcoidosis (possibly related to EDS), his lung collapsed requiring a 5 day hospital stay with chest tube to re-inflate the lung. Sarcoidosis was ruled out but the lung biopsy showed evidence of abnormal lymph tissue.  A PET scan to evaluate the lymph tissue was denied by his health insurer so another bronchoscopy was performed to assess lymphoid tissue.  A subsequent reaction to the second bronchoscopy caused neck swelling and difficulty breathing, and he was hospitalized overnight for observation."

23.     The CPET evaluation provides irrefutable, objective medical evidence that shows Alexander is unable to return to work at his own or any occupation.

24.     As the CPET study indicates, Alexander's anaerobic threshold is 12.9 ml.kg-1min. and decreased to 6.8 during test 2.  Anaerobic threshold is the point during incremental exercise when production of energy is derived increasingly through anaerobic (v. aerobic) metabolism.  Energy production from anaerobic processes is limited and requires rest or low intensity activity to recover.  Unlike aerobic energy production, anaerobic energy production cannot be maintained for long durations without causing unusual fatigue and/or necessitating

1   recovery.

2   25.   The CPET report explains: "Because Mr. Alexander's VO2 max is
3   also low relative to age and sex standards, the actual VO2 at which
    AT occurred for both tests represent a reduced ability to work. . . .
4   Activities such as walking around an office at a moderate speed,
    walking at a moderate pace for transportation, or raking leaves
5   would require him to work at or above his AT.  When fatigued, his
    AT decreased to 1.7 MTD at OW.  This is consistent with very low
6   intensity activities such as basic self-care tasks (preparing for bed,
    toileting, brushing teeth, etc.)  These and comparable activities
7   would exacerbate Mr. Alexander's symptoms."

8   "These results indicate a substantially reduced threshold for
    aerobic metabolism, above which Mr. Alexander derives most of
9   his energy from anaerobic production.  **For Mr. Alexander,
    energy production begins to shift increasingly to anaerobic
10  processes while doing activities, based on corrected METS=3.2
    from test 1, such as sweeping floors, washing dishes, cooking or
11  walking and carrying a small child; whereas walking/running
    while playing with his children or doing moderate home repair
12  tasks would exceed his AT.  However, when experiencing post-
    exertional symptoms, his AT occurred at 1.7 METS, which is
13  comparable to standing and washing dishes, reading, talking
    on the phone, whereas driving a vehicle, walking for
14  transportation (e.g., to a bus stop), or walking slowly around
    an office, would exceed his anaerobic threshold.** *As such,
15  normal daily activities require this patient to work at or above AT,
    causing excessive fatigue that is not normally commensurate with
16  these types of activities."*

17                            * * * *

18  "For most individuals, physical demands are considered
    appropriate if the 8-hour energy expenditure requirement averages
19  less than or equal to 50% peak METS. . . . For Mr. Alexander, 50%
    of peak METS is 4.0 METS (corrected).  Examples of daily
20  activities that require this intensity include cycling slowly/leisurely
    or raking the lawn.  To do these activities, Mr. Alexander would
21  have to work above *his* anaerobic threshold. . . . Additionally, job
    tasks comparable to the demands of Mr. Alexander's occupation
22  range from 3.5 to 5 METs, are approximately 44-63% of his
    maximum capacity, and exceed his anaerobic threshold.  For Mr.
23  Alexander, activities equal to or more vigorous than those
    mentioned above. . . will cause premature and unusual fatigue, and
24  exacerbate his symptoms.  It is important to note that post-exertion
    exhaustion can occur immediately after physical activity or can be
25  delayed for hours or days, thus it is plausible because of the cyclic
    nature of his symptoms, that Mr. Alexander's functional capacity
26  could decline further over days following physical and/or cognitive
    exertion. *As a result, Mr. Alexander must work above his
27  anaerobic threshold to perform home and job-related activities.
    Consequently, his ability to perform such activities is limited and
28  the resultant fatigue renders him unable to perform his occupation
    . . ."*

26.     By letter dated August 18, 2014, Alexander appealed the denial of his STD and LTD benefits. Alexander's August 18, 2014, appeal consisted of an 82-page appeal from Alexander's attorney; a sworn declaration by Alexander, medical records, and various other documents. The appeal letter summarized Alexander's functionality, summarized the opinions of Alexander's doctors, as more fully set forth in Paragraph 16-20 above, summarized the procedures and conclusions of the CPET, as more fully set forth in Paragraphs 21-25, above, explained that Anthem failed to perform a proper vocational review; explained that Anthem and its reviewers failed to properly consider fatigue, pain, mental clouding, and the side effects of medications as disabling conditions; explained that Anthem's medical opinions are entitled to no weight and would not be considered by any court; that Anthem's decision to deny STD and LTD benefits was contrary to the evidence; explained that Anthem failed to consider Alexander's condition as a whole person; explained that Anthem failed to have Alexander examined; explained that the CPET provides objective proof of disability and that Alexander's treating physicians' opinions are further evidence of Alexander's disability; and concluded Alexander was and is totally disabled under the terms of the policy, that Anthem ignored the opinions of Mr. Alexander's physicians opinion, and that Anthem intentionally withheld documents.

27.     In order to evaluate Alexander's appeal, Anthem utilized the services of Reliable Review Services, LLC ("RRS") to provide medical reviewers and medical reports.

A.     When an insurance company or third party administrator hires RRS it sends instructions and questions together with medical records to RRS.

B.     RRS then selects the doctors specified by specialty, based on a computer program.

C.     RRS then sends a confirming letter to the specialist specifying how much time in minutes he or she may spend on the assignment.

D.     RRS then sends the questions from the insurance company on a template to the doctor or doctors.

E.     The doctor or doctors then answer the questions on the template and "attests" that he or she has reviewed all the records provided, utilized "evidence based criteria" and also specifies how many minutes he or she used to perform the work.

F.     A nurse employed by RRS then reformats the answers to create the report and, often changes the answers.

G.     RRS then bills the insurance company.

28.     RRS obtained medical reviews ostensibly completed by Drs. Dayton Dennis Payne, Marcus Goldman, and Richard Kaplan.

A.     None of the RRS reviewing doctors references the CPET report so it appears that none of them was provided the report.

B.     Each RRS reviewing doctor ostensibly reviewed records in isolation from each other and thereby providing opinions which don't take into account the effect of comorbid conditions.

C.     Each of the reviewing doctors from RRS limited his evaluation to objective findings even though The Policy explicitly allows an award of STD benefits and LTD benefits for verifiable proof at least 24 months without objective findings, i.e., objectively.

D.     None of the RRS reviewing doctors commented on the contents of Alexander's declaration.

E.     None of the RRS reviewing doctors explained why he disagreed with the opinions of Alexander's treating physicians.

29.     Upon receiving the RRS doctors reviews Anthem, by Kali McCloud, prepared an appeal summary and recommendation summarizing the opinions set forth in the RRS doctors review reports but not otherwise addressing any of the issues raised in Alexander's appeal, as summarized in Paragraph 26 above.

30.     By letter dated October 23, 2014, signed by Anthem's Kali McCloud, Anthem denied Alexander's STD and LTD appeal. Anthem's October 23, 2014 letter, like Kali McCloud's appeal recommendation, simply summarized the reports of the three RRS reviewing doctors and failed to address the CPET report or any of the issues raised in Alexander's appeal letter or declaration, as summarized in Paragraph 26 above.

31.     Alexander has exhausted all administrative remedies required to be exhausted by

him.

32.     29 U.S.C. section 1133 and its implementing Regulations require Anthem to provide Plaintiff a full and fair review of his claims for STD and LTD benefits as follows:

A.     29 U.S.C. section 1133 mandates that, in accordance with the Regulations of the Secretary of Labor, every employee benefit plan, shall provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant and affording a reasonable opportunity to any participant whose claim for benefits has been denied a full and fair review by an appropriate named fiduciary of the decision denying the claim.

B.     The Secretary of Labor has adopted Regulations to implement the requirements of 29 U.S.C. section 1133. Those Regulations are set forth in 29 C.F.R. section 2560.503-1 and provide, as relevant here, that employee benefit plans shall establish and maintain reasonable procedures governing the filing of benefit claims, notifications of benefit determinations, and appeal of adverse benefit determinations and that such procedures shall be deemed reasonable only if:

i.     Such procedures comply with the specifications of the Regulations.

ii.    Such procedures contain administrative processes and safeguards designed to ensure and to verify that benefit determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants.

iii.   Written notice is given regarding an adverse determination (i.e., denial or termination of benefits) which includes: the specific reason or reasons for the adverse determination; with reference to the specific plan provisions on which the determination is based; a

description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; a description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following a denial on review; if an internal rule, guideline, protocol, or similar criterion was relied upon in making the adverse determination, the plan is required to provide either the specific rule, guideline, protocol, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

iv.   Plans are required to provide a full and fair review of any adverse determination which includes:

a.   That a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits both prior to

submitting an appeal and after an appeal has been denied.

b.   Under the Regulations, a document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information: (1) was relied upon in making the benefit determination; (2) was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was

relied upon in making the benefit determination; (3) demonstrates compliance with the administrative processes and safeguards required pursuant to the Regulations in making the benefit determination; or (4) constitutes a statement of policy or guidance with respect to the plan concerning the denied benefit for the claimant's diagnosis without regard to whether such statement was relied upon in making the benefit determination.

c. The Regulations further provide that a review must take into account all comments, documents, records and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination;

d. The Regulations further provide that, in deciding an appeal of any adverse determination that is based in whole or in part on a medical judgment that the appropriate named fiduciary shall consult with a healthcare professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

e. The Regulations further require a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal nor a subordinate of such individual.

f. The Regulations further provide that a healthcare professional engaged for the purposes of a consultation for an appeal of an adverse determination shall be an individual

who is neither the individual who was consulted in connection adverse benefit determination which was the subject of the appeal nor the subordinate of any such individual.

g.   The Regulations further provide that the plan administrator shall provide a claimant with written or electronic notification of a plan's benefit determination on review and in the case of an adverse determination the notification shall set forth the specific reason or reasons for the adverse determination and reference to the specific plan provisions in which the benefit determination is based.

33.   Anthem breached its fiduciary duties and denied Plaintiff a full and fair review of his claims for STD and LTD benefits as follows:

A.   Anthem and The Plan either do not have claims procedures which contain administrative processes and safeguards designed to ensure and to verify that benefit determinations are made in accordance with governing plan documents and that, where appropriate, plan provisions have been applied consistently with respect to similarly situated claimants or deliberately withheld such procedures. Plaintiff requested that Anthem provide all such documents demonstrating such claims procedures. In response to these requests, Anthem provided some documents, but none demonstrating compliance with the Regulations thereby either admitting it and the plan have none, in violation of the Regulations, or thereby violating the Regulations by failing to provide such documents it does have.

B.   Anthem, when denying Plaintiff's claims for STD and LTD benefits did not provide a description of the additional material or information necessary for Plaintiff to perfect his claims or an explanation of why such material or information was necessary.

C.   Anthem did not consider the comments and documents submitted in support of Plaintiff's joint STD/LTD appeal.  Most significantly, neither Anthem nor its reviewing doctors addressed or considered the CPET report and Anthem ignored most of the facts and issues raised in Alexander's August 18, 2014 STD/LTD appeal letter and declaration.

D.   Anthem and The Plan do not have standards or criterion to ensure that plan provisions are consistently applied.  Instead plan provisions are given no consistent meaning or application but instead are construed and applied on a case-to-case basis in a manner intended to deny claims for benefits and to present claimants with a "moving target" as to how to comply with plan requirements.

E.   Plaintiff requested that Anthem provide him with copies of all documents, records, or other information relevant to his claim, as that term is defined by ERISA regulations.  Anthem failed and refused to provide him with all such documents records and other information.  Most significantly, Anthem did not provide the documents and materials created by RRS and its reviewing doctors except the final reports ostensibly written by Drs. Payne, Goldman and Kaplan but actually written, in full or in part, by an RRS nurse.

F.   Anthem did not fairly, reasonably or accurately evaluate Plaintiff's medical conditions because it did not consider the global, whole-person nature of Plaintiff's health concerns or examine the overall state of his health, but instead instructed its reviewing doctors to evaluate discrete issues in isolation and then Anthem and the plans disregarded the compounding effects of Plaintiff's co-morbid conditions.

G.   Anthem evaluated Plaintiff's claims, in full or in part, based on a claimed absence of "objective evidence" and by disregarding and discounting "subjective evidence" or "self-reports", such as pain and fatigue, even

though the STD portion of The Policy and the LTD portion of The Policy for 24 months do not require objective evidence Anthem disregarded and failed to consider the CPET, by which Plaintiff submitted objective evidence of fatigue and disability.

H. Anthem solicited false evidence and condoned the presentation of false evidence, and relied upon that false evidence - - i.e., the three RRS doctors' reports.

I. As a matter of common practice, Anthem either fails to obtain all relevant evidence or selectively provides evidence to its reviewing doctors. Thus the doctors conducting reviews are basing their opinions on incomplete evidence. Most significantly, Anthem either did not provide the CPET report to its reviewing doctors or they all deliberately ignored it.

J. Anthem demands that reviewing doctors limit their reviews to narrow issues: one doctor evaluates psychiatric issues; another doctor evaluates pain issues; but no doctor evaluates the individual's global overall conditions.

K. Anthem obtained its final appeal review reports from Reliable Review Services, ("RRS"), which provided Anthem with a three-doctor report, ostensibly prepared in part by Dr. Dayton Dennis Payne, M. D., and in part by Dr. Marcus Goldman, M.D. and in part by Dr. Richard Kaplan, M.D. Plaintiff is informed and believes, and thereon alleges that these reports were not actually written by the doctors to whom they are attributed, but are actually written by a nurse employee of RRS.

L. Defendants Anthem and The Plan have otherwise violated the Regulations.

34. This Court should review Anthem's decision with limited deference because:

A. Anthem has a conflict of interest.

B. Anthem is motivated by its financial self-interest.

C. Anthem failed to comply with ERISA's procedural requirements regarding

1                   benefit claims procedures and full and fair review of benefit claim denials

2                   as set forth in Paragraphs 32 and 33.

3        D.     Anthem utilized medical experts to review Plaintiff's medical records who

4                   had a financial conflict of interest, and therefore did not provide a neutral,

5                   independent review process.

6        E.     Anthem utilized false evidence to support its appeal denial decision.

7     35.     Defendants' denial of Plaintiff's STD and LTD benefits was arbitrary and

8 capricious, an abuse of discretion, and a violation of the terms of The Policy.

9     36.     An actual controversy has arisen and now exists between Plaintiff and Defendants

10 with respect to whether Plaintiff is entitled to STD and LTD benefits under The Policy.

11     37.     Plaintiff contends, and Defendants dispute, that Plaintiff is entitled to benefits

12 under the terms of The Policy for STD and LTD benefits because Plaintiff contends, and

13 Defendant disputes, that Plaintiff is totally disabled, as that term is defined by The Policy.

14     38.     Plaintiff desires a judicial determination of his rights and a declaration as to which

15 party's contention is correct, together with a declaration that Defendants are obligated to pay STD

16 and LTD benefits, under the terms of The Policy, until and unless such time that Plaintiff is no

17 longer eligible for such benefits under the terms of The Policy or, in the alternative an order

18 remanding the matter to Anthem, as the claim fiduciary, to conduct a full and fair review.

19     39.     A judicial determination of these issues is necessary and appropriate at this time

20 under the circumstances described herein in order that the parties may ascertain their respective

21 rights and duties, avoid a multiplicity of actions between the parties and their privities, and

22 promote judicial efficiency.

23     40.     As a proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff

24 was required to obtain the services of counsel to obtain the benefits to which he is entitled under

25 the terms of The Policy. Pursuant to 29 U.S.C. section 1132(g)(1), Plaintiff requests an award of

26 attorneys' fees and expenses as compensation for costs and legal fees incurred to pursue

27 Plaintiff's rights.

28     WHEREFORE, Plaintiff prays judgment as follows:

1.     For declaratory judgment against Defendants, requiring Anthem to grant STD and LTD benefits under the terms of The Policy for the periods to which Plaintiff is entitled to such benefits, until and unless it is determined that Plaintiff is no longer eligible for such benefits under the terms of The Plans.

2.     Alternatively, if for any reason judgment in favor of Plaintiff is not entered as prayed, for an order remanding the matter to Anthem with instructions to accord Plaintiff a full and fair review of his claims for STD and LTD benefits.

3.     For attorneys' fees pursuant to statute.

4.     For costs of suit incurred.

5.     For such other and further relief as the Court deems just and proper.

Dated: December___, 2014
Jan 7, 2015

JULIET PURLL, Bar No. 46418
Purll Law LLC
933 North Kenmore Street, Suite 318
Arlington, VA 22201
T: 703-660-1020
F: 202-403-3361
E: jpurll@purlllaw.com

Dated: December 22, 2014

THORNTON DAVIDSON, California Bar
No. 166487
ERISA LAW GROUP, LLP
6485 N. Palm Avenue, Suite 105
Fresno, CA 93704
T: 559-478-4119
F: 559-478-5939
E: thornton@erisalg.com